**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 08-60630-CIV-ALTONAGA**

**EQUITY INVESTMENT PARTNERS, LP**,

      Plaintiff,

vs.

**KARIN LENZ** and
**UNITED STATES OF AMERICA**,

      Defendants.
_____/

**UNITED STATES OF AMERICA**,

      Counterclaim and Crossclaim Plaintiff,

vs.

**EQUITY INVESTMENT PARTNERS, LP**,

      Counterclaim Defendant,

vs.

**KARIN LENZ**,

      Crossclaim Defendant.
_____/

**ORDER SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case was tried to the Court on June 21, 2010.  The Court has carefully considered the testimony of the witnesses, Randolph Lenz, Karin Lenz, and Stacie Daley for Plaintiff, Equity Investment Partners, LP ("Equity"); and Calvin Byrd of the Internal Revenue Service ("IRS") for the Defendant and Counterclaim Plaintiff, United States.  In addition, the Court has considered the exhibits admitted in evidence, the parties' written submissions, and applicable law.  The following findings of fact and conclusions of law are now made pursuant to the requirements of Rule 52 of the

Case No. 08-60630-Civ-Altonaga

Federal Rules of Civil Procedure.

## I.  UNCONTESTED FACTS

Unless otherwise noted, the following uncontested facts are taken from the parties' Joint Pretrial Stipulation [ECF No. 106] and provide a useful background for the Court's factual findings.[1] Plaintiff, Equity, was formed on January 20, 1995, as an investment partnership by Randolph W. Lenz ("Mr. Lenz"), G. Chris Anderson, Stephen D. Weinroth, and Equity Investment Partners LLC. On February 28, 2000, ALFT, L.L.C. became a limited partner.  On February 29, 2000, the three individuals withdrew as partners, leaving Equity Investment Partners, LLC and ALFT, L.L.C. as partners.  By November 17, 2000, Equity had four partners: Equity Investment Partners, LLC; the Freida Trust (which held a one percent partnership interest); and Stacie Daley ("Ms. Daley") and Corbett Lenz ("Corbett"), Randolph Lenz's children, who each held a 49 percent interest.

On September 1, 1999, Alass Investment Partners, Ltd. issued a warranty deed to Mr. Lenz for property located at 30 Compass Point, in Fort Lauderdale, Florida (the "subject property").  On January 1, 2002, Equity and Mr. Lenz entered into a Loan and Security Agreement.  The Loan and Security Agreement does not contain a loan amount or repayment terms, but states that Mr. Lenz has granted Equity a security interest in all of his assets as security for the loan, including the subject property.  That same day, Mr. Lenz and Equity executed a master promissory note under which Mr. Lenz promised to repay advances made by Equity on his behalf.  The note states the amount outstanding under it shall not exceed $5,000,000.

---

[1]  No citations are included in this section following any quoted text, as the parties did not include them in their Pretrial Stipulation.

Case No. 08-60630-Civ-Altonaga

On June 16, 2004, Mr. Lenz and his wife, Defendant Karin Lenz ("Mrs. Lenz"), signed a "Closing Agreement as to Final Determination of Tax Liability and Specific Matters" with the IRS, to "determine with finality" their tax liability for the years 1989, 1990, 1992, and 1993. On August 2, 2004, the IRS made assessments against Mr. and Mrs. Lenz for unpaid income taxes for the tax years 1989, 1990, 1992, and 1993.[2]  As of May 19, 2008, the outstanding liability for those assessments was $2,183,991.72.

On October 19, 2004, Equity and Mr. Lenz entered into a mortgage and security agreement for $300,000 that covered property not at issue in this case located at 3900 Galt Ocean Drive in Fort Lauderdale, Florida. This property is currently owned by Equity.

The next day, on October 20, Mrs. Lenz issued a Promissory Note (Tr. Ex. 48)[3] to Equity in the amount of $1,000,000, and a Mortgage and Security Agreement (Tr. Ex. 43) to Equity granting Equity a $1,000,000 mortgage on the subject property. At the time of this agreement, Equity did not contemporaneously advance $1 million to Mrs. Lenz. Also at that time, a first mortgage already existed on the subject property, and Mrs. Lenz owned no other property and had no other assets.

On February 22, 2005, a warranty deed dated June 11, 2002 was recorded in the public records of Broward County, Florida. The warranty deed changed title to the subject property from Mr. Lenz to Mrs. Lenz.

Approximately nine months after her first Promissory Note, on August 1, 2005, Mrs. Lenz

---

[2]  Notwithstanding this statement in the Pretrial Stipulation, according to the IRS, the Lenzes' 1989 tax liabilities have been satisfied and are not at issue.

[3]  References to trial exhibit numbers are included as to only the key documents at issue.

Case No. 08-60630-Civ-Altonaga

issued a second Promissory Note (Tr. Ex. 49) to Equity in the amount of $3,000,000. That same day Mrs. Lenz also issued a Mortgage Modification Agreement (Tr. Ex. 44) to Equity that increased Mrs. Lenz's mortgage for the subject property by $2,000,000.[4]  At the time of this modification, Equity did not contemporaneously advance $2 million to Mrs. Lenz.  On August 2, 2005, Mrs. Lenz and Equity entered into a promissory note for advances not to exceed $6,000,000.  And on August 13, 2005, Mrs. Lenz issued a Correction Statement to Mortgage Modification Agreement to Equity.

Three days later, on August 16, 2005, the IRS recorded a tax lien against Mr. and Mrs. Lenz for unpaid income taxes for the years 1989, 1990, 1992, and 1993 in the public records of Broward County, Florida.  As of the date the notice was prepared, August 8, 2005, the unpaid balance of those liabilities was $2,406,549.86.  The notice of federal tax lien refers to the subject property.

Between May 30, 2002 and December 22, 2003, Equity made twelve wire transfers to Mr. Lenz's account totaling $1,188,500.  Between January 15, 2003 and February 25, 2003, Equity Merchant Banking Corporation made four wire transfers to Mr. Lenz's account totaling $281,000. Between July 9, 2003 and September 16, 2003, First Out Corporation made three wire transfers to Mr. Lenz's account totaling $36,000.  Between January 5, 2004 and April 29, 2004, Equity made ten wire transfers to Mr. Lenz's account totaling $31,000.  On January 13, 2004, Equity transferred $43,261.28 to the law firm of Winston & Strawn, and between January 13, 2004 and January 10, 2005, Equity wrote three checks to Winston & Strawn totaling $884,416.15.  Between January 6, 2004 and December 23, 2004, Equity made 52 wire transfers to Equity Merchant Banking Corporation totaling $1,216,000.

---

[4]  The Mortgage Modification Agreement was recorded on August 12, 2005.

4

Case No. 08-60630-Civ-Altonaga

In November 2004, as part of a settlement entered into with the Federal Deposit Insurance Corporation ("FDIC"), Corsta Corporation transferred $8.5 million to the FDIC, resulting in a settlement of all claims against Mr. Lenz, Mrs. Lenz, Ms. Daley, and Corbett, as well as other entities.

On January 3, 2005, Equity and Mr. Lenz amended their loan and security agreement. The amended agreement states that a limited partner of Equity "made a certain loan to [R. Lenz] in the amount of Eight Million Dollars," and as security, Mr. Lenz "agreed to grant a security interest to Equity." Equity Merchant Banking Corporation also paid a substantial amount of funds to Mr. Lenz, made payments to Mrs. Lenz, covered many household expenses, paid taxes on the subject property, paid the first mortgage on the subject property, and made loans to Mr. and Mrs. Lenz.

Ms. Daley and Corbett, through Equity, have paid and continue to pay the taxes and mortgage payments for the subject property. Mrs. Lenz did not make any payments under the mortgage or the mortgage modification.

## II.  FACTUAL FINDINGS

The first witness who testified for Equity at trial, Mr. Lenz, stated that prior to January 1, 2002, he had been borrowing money from his children because he had no liquidity. (*See* Hr'g Tr. 19).[5]  Mr. Lenz knew he was going to need liquidity, however, particularly for legal fees in administrative proceedings with the FDIC against the Connecticut Bank of Commerce ("CBC"), for which he was the President, Chairman of the Board, and majority shareholder. (*See id.*). Thus, in

---

[5]  None of the parties has requested an official transcript of the trial proceedings. Therefore, the references "Hr'g Tr." are to the unofficial transcript of the trial.

Case No. 08-60630-Civ-Altonaga

order for Mr. Lenz to secure some liquidity, on January 1, 2002, Mr. Lenz and Equity entered into a Loan and Security Agreement (Tr. Ex. 66), which specifically references the "Loan" to Mr. Lenz. Also on January 1, 2002, Equity and Mr. Lenz entered into a Master Promissory Note (Tr. Ex. 67) for $5 million, and as of that date, Exhibit A to the Note showed advances of $1.5 million anticipated for Mr. Lenz's legal fees for the years 2002 to 2004.  Mr. Lenz clarified that the legal fees included fees for his wife, Mrs. Lenz, as she was also a party to the legal proceedings against the CBC.  (*See* Hr'g Tr. 20).  Equity continued to loan money to Mr. Lenz for other expenses because the FDIC closed the CBC in the summer of 2002 and froze Mr. Lenz's assets in the fall of 2002.  (*See id.* 18). When Equity loaned Mr. Lenz money, Mr. Lenz's children would have Equity transfer the funds to Mr. Lenz's bank account.  (*See id.*).

Mr. Lenz also testified that at some point in time he transferred title to the subject property to Mrs. Lenz.  (*See* Hr'g Tr. 20).  He did so because she had insisted for many years that the house, which was not in her name, be transferred to her; it was something she had wanted for many, many years.  (*See id.*).  Mr. Lenz "saw no reason not to do so."  (*Id.*).  He acknowledged that at the time the warranty deed (Tr. Ex. 69) was issued to Mrs. Lenz, he was aware of outstanding tax issues he had with the IRS.  (*See* Hr'g Tr. 21).  On the date he and Mrs. Lenz discussed the transfer of the house, he and Mrs. Lenz also discussed a Loan and Security Agreement between Mrs. Lenz and Equity (Tr. Ex. 77), dated June 11, 2002, which "was just a continuation of the agreement [he] had already entered into but it was in her name now."  (Hr'g Tr. 21).  After the FDIC action settled for $8.5 million, he entered into an Amended Loan and Security Agreement (Tr. Ex. 68) with Equity on January 3, 2005, because the funds came from the children and the amount of money he had

borrowed exceeded the original Loan and Security Agreement.  (*See* Hr'g Tr. 22-23).  By January

2005, the children had loaned the Lenzes in excess of $10 million.  (*See id.*).

Mrs. Lenz was the second witness to testify.  She acknowledged she never made a single

payment on the original note of October 20, 2004.  Nonetheless, Equity and Mrs. Lenz entered into

a second agreement – the Mortgage Modification Agreement – on August 1, 2005, increasing Mrs.

Lenz's mortgage by an additional $2 million.[6]  The mortgage modification was entered into one

week before the IRS prepared a Notice of Federal Tax Lien against Mr. and Mrs. Lenz for their

federal tax liabilities, on August 8, 2005, and two weeks before the IRS filed its Notice of Federal

Tax Lien in the public records of Broward County, Florida related to those liabilities, on August 16,

2005.  As with the mortgage, Karin Lenz never made a single payment on the mortgage

modification.

At the time she entered into the mortgage, Mrs. Lenz was indebted to the IRS for several

million dollars.  Mrs. Lenz incurred the mortgage shortly after the IRS assessed against her a

substantial tax debt, to which she had agreed, and she signed the mortgage modification shortly

before the IRS filed a Notice of Federal Tax Lien against her and Mr. Lenz to secure that debt.  At

the time she entered into the mortgage and promissory note, Mrs. Lenz knew that incurring the

mortgage would render her insolvent.  Furthermore, at the time she entered into the mortgage and

promissory note, Mrs. Lenz, an educated woman with a master's degree in social work, earned no

---

[6] The Mortgage Modification states it is between Karin Lenz and Equity Investment Partners, LLC, another entity owned by Ms. Daley and Corbett.  On August 23, 2005, Equity and Mrs. Lenz executed a "Correction Statement to Mortgage Modification Agreement," clarifying that Equity, not Equity Investment Partners, LLC, is the correct party to the Mortgage Modification Agreement.

Case No. 08-60630-Civ-Altonaga

income and had no assets other than the subject property.

At the time she entered into the mortgage and promissory note, Mrs. Lenz did not have record title to the subject property. Indeed, she did not acquire record title until February 22, 2005. At the trial, when questioned regarding the transfer of title of the subject property from her husband to her, Mrs. Lenz smiled uncomfortably for the first time during her questioning and gave the following rather incredible testimony, although admittedly consistent with her husband's just moments before:

> Q. How did you become the owner of the property?
> A. I asked to have the house turned over in my name.
>
> Q. Why?
> A. I've asked my husband for years. I just – I wanted to own something and that was the only reason and I guess I got on his nerves and then he finally did.
>
> Q. At the time that the property was transferred to you were you aware of any tax issues with the IRS?
> A. No, I had no idea.

(Hr'g Tr. 40-41). On February 22, 2005, the warranty deed executed years before, on June 11, 2002, and through which Mrs. Lenz acquired the subject property from Mr. Lenz, was recorded in the public records of Broward County, Florida.[7]

Mrs. Lenz also claimed not to have been aware of the Lenzes' tax liabilities until three or four months before her deposition was taken in November 2008. (*See id.* 46-47). And yet, in June 2004 she signed a closing agreement with the IRS acknowledging the couple's federal tax liabilities (Tr. Ex. 75). Moreover, Mrs. Lenz claims she does not remember seeing an August 2, 2004 notice sent

---

[7] As stated previously, the subject property was originally purchased in 1988 by Alass Investment Partners, a partnership owned by Randoph Lenz. On September 1, 1999 Alass Investment Partners transferred the property to Mr. Lenz.

8

to the subject property regarding the balances owed (*see* Hr'g Tr. 49), and she does not remember seeing another one mailed on September 6, 2004 (*see id.*), as, according to her, "[w]hatever I got from the IRS I gave to my husband" (*id.*). She similarly lacks recollection of a notice of intent to levy the Lenzes' assets mailed in January 2005: "[S]ometimes I don't even open the mail I just give it to my husband." (*Id.*). After these extraordinary statements, she then corrected herself and stated, "I'm sure I looked at them and gave them to my husband." (*Id.*).

Mrs. Lenz next gave inconsistent testimony regarding her role in executing the promissory note, mortgage, and mortgage modification. As to the promissory note (Tr. Ex. 48), at trial Mrs. Lenz stated in direct examination that she entered into the note "[t]o borrow money from my children." (Hr'g Tr. 43). But at her earlier deposition in November 2008, Mrs. Lenz did not remember anything about when she signed the promissory note, nor did she remember why she signed it. (*See* K. Lenz. Dep. 17-19 [ECF No. 43-11]).

With regard to the mortgage (Tr. Ex. 43), at trial Mrs. Lenz insisted she remembers why she signed it (although she does not remember signing it (*see* Hr'g Tr. 50-51)), and that her husband probably gave it to her to sign (*see id.* 50). Meanwhile, in November 2008, Mrs. Lenz gave contrary testimony:

Q. Do you remember anything about signing this agreement?
A. I signed it, but I do not remember, no.

Q. Do you remember who gave it to you to sign?
A. No, I don't.

Q. Did anyone tell you why you were signing it?
A. I don't remember.

Q. Did anyone tell you what it was for?

A.      I don't remember.

Q.      Do you know where this figure of $1,000,000 came from?
A.      No, I don't.

Q.      Did you ever receive $1,000,000 from Equity Investment Partners around the
        time of this document in October of 2004?
A.      No, I did not.

(K. Lenz Dep. 16). Mrs. Lenz admitted she signed the mortgage four months after the IRS and she

entered into the closing agreement and two months after the IRS had made assessments against her.

(*See* Hr'g Tr. 55).

With respect to the mortgage modification, at her deposition Mrs. Lenz acknowledged her

signature on the mortgage modification, did not remember who asked her to sign it, but "[p]robably"

signed it "so I can pay my children back." (K. Lenz Dep. 20). The "children" had been paying the

bills for Mrs. Lenz (*id.*), and the mortgage modification was for all of the "previous stuff" they had

been paying for (*id.* 20-21). At trial, Mrs. Lenz remembered her husband was probably the one who

asked her to sign it. (*See* Hr'g Tr. 57). The 2005 promissory note for $3,000,000 (Tr. Ex. 49), which

Mrs. Lenz signed along with the mortgage modification, states Mrs. Lenz would make payments of

principal and interest to Equity beginning September 1, 2005, but at that time she had no job, no

source of income, no assets, and no ability to make payments. (*See* Hr'g Tr. 59).

Despite never having made a single payment on the mortgage or mortgage modification, Mrs.

Lenz retained possession of the subject property for years. While she defaulted on September 1,

2005 under the mortgage modification, Equity did not file this foreclosure suit until 2008. (*See* Hr'g

Tr. 60). Her children never demanded payment.

Equity did not advance $1 million to Mrs. Lenz at the time of the mortgage, and it did not

10

Case No. 08-60630-Civ-Altonaga

advance an additional $2 million to her at the time of the mortgage modification. Rather, according to Ms. Daley, testifying as an Equity representative, the mortgage and mortgage modification were executed to secure past payments made by Ms. Daley and Corbett to their parents. Equity also asserts that the mortgage and mortgage modification secure unspecified living expenses of Mrs. Lenz, paid for by various entities owned and controlled by Ms. Daley and Corbett. Finally, Equity asserts that the mortgage and mortgage modification secure $1,216,000 transferred from Equity to Equity Merchant Banking Corporation between January 6, 2004 and December 23, 2004.

Ms. Daley agreed with her parents that over the years, she and Corbett advanced funds to their father, Mr. Lenz, through various entities they controlled.[8] At the time of the mortgage modification, Ms. Daley had no hint the IRS was going to record any type of tax lien on the subject property. (*See* Hr'g Tr. 81). Although she stated the $1 million was an estimate of past payments made, she acknowledged Equity had loaned her parents over $2 million by October 2004. (*See* Hr'g Tr. 85). Tellingly, at the time her deposition was taken in this case, Ms. Daley did not remember why the mortgage was for $1 million or why the mortgage modification for $2 million. (*See id.* 84).

---

[8] These fund transfers are detailed in the parties' Uncontested Facts. One of the payments was Corsta Corporation's payment of $8,500,000 to the FDIC pursuant to a settlement entered into between the FDIC and the Lenzes, Ms. Daley, Corbett, and various Lenz-related entities. The FDIC closed the CBC in June 2002 due to banking irregularities. Mr. Lenz pleaded guilty on October 4, 2004 to misapplication of bank monies, admitting that he caused up to $5 million in losses to the CBC and involved others in the misapplication of CBC monies. On November 17, 2004, the FDIC reached a settlement agreement with Mr. Lenz and numerous "Lenz-related parties," including Mrs. Lenz, Ms. Daley, Corbett, Equity, the Freida Trust, Equity Merchant Banking Corporation, Equity Merchant Banking Partners, LLLP, First Out Corporation, and Alass Corporation. The settlement resolved various lawsuits then pending between Mr. Lenz, the Lenz-related parties, and the FDIC. Pursuant to the settlement, Mr. Lenz and the Lenz-related parties paid the FDIC $8,500,000. Also, the FDIC released its holds on various deposit accounts at issue in the litigation, including that of Equity. On January 24, 2005, Mr. Lenz was sentenced to 51 months of imprisonment, followed by three years of supervised release, for misapplication of bank monies.

Case No. 08-60630-Civ-Altonaga

The pertinent documents do not support the testimony. Nothing in the mortgage or mortgage modification references past payments to Mr. or Mrs. Lenz. Neither the mortgage nor the mortgage modification specifies what payments each allegedly secures, and neither contains repayment terms.

The promissory notes allegedly secured by the mortgage and mortgage modification also do not reference past payments to Mr. or Mrs. Lenz. The October 20, 2004 promissory note (Tr. Ex. 48) states only that Mrs. Lenz promises to pay Equity $1 million, and the August 1, 2005 promissory note (Tr. Ex. 49) states only that Mrs. Lenz promises to pay Equity $3 million. The August 2, 2005 promissory note (Tr. Ex. 50), in which Mrs. Lenz promises to pay Equity principal and interest on advances not to exceed $6 million, explicitly states that advances are "in amounts outlined on Exhibit 'A'" (*id.* 1), but no exhibit "A" is attached. And although Equity loaned the Lenzes $1.5 million dollars in 2003 (Tr. Ex. 31), it did not record a mortgage in 2003.[9] (*See* Hr'g Tr. 87).

The only evidence presented to support that Equity and Mrs. Lenz entered into the mortgage and mortgage modification to secure past payments is the non-credible testimony of the Lenzes and their daughter, Ms. Daley, as well as some of the financial records admitted in evidence. The Court discounts the testimony of Mr. Lenz, a convicted felon, as untrustworthy and self-serving. Mrs. Lenz, while well-educated, feigns ignorance of the details of numerous documents and financial arrangements, purporting to be the mindless, gullible wife of a successful (former) businessman, who merely signs whatever documents are placed in front of her. She gives incredible testimony concerning her powers of persuasion, stating that simply because she wanted the subject multimillion

---

[9] While by 2003 Equity had loaned the Lenzes money, no notes receivable appear in the Equity balance sheets (Tr. Ex. 17) until 2004, and then, in the name of Mr. Lenz, not Mrs. Lenz. (*See* Hr'g Tr. 93-94).

dollar property to be hers, her husband deeded it to her after she so nagged him.   While at her deposition Mrs. Lenz claimed not to remember executing the mortgage or mortgage modification, why she executed them, or the reasons for the amounts listed therein, at trial she had a recollection of these matters.

The Lenzes and their daughter, Ms. Daley, cannot credibly explain why the mortgage was for $1 million and the mortgage modification was for an additional $2 million.   There is no correlation between the amounts of the mortgage and mortgage modification and the amounts of past payments Equity claims were secured by those agreements.   Indeed, by its own accounting, Equity had already advanced more than $1 million to Mr. Lenz before the mortgage was entered into: at the time of the $1 million mortgage, Equity had already made payments to Mr. Lenz totaling $1,188,500 in 2003 and $524,261.28 in 2004.

Moreover, in the period between the mortgage and mortgage modification, Equity – again, by its own accounting – made only two payments on behalf of Mr. Lenz: a payment of $54,597.41 on January 21, 2005 and a payment of $379,818.74 on January 10, 2005.   Yet the following August – just before the Government filed its Notice of Federal Tax Lien – Equity increased its mortgage by $2 million, and the Lenzes' uniform explanation at trial that such increase was to account for past amounts loaned rings false.

Similarly, the Lenzes provide no credible explanation for the timing of either the mortgage or mortgage modification given by Mrs. Lenz to her children's controlled limited partnership.   Mrs. Lenz did not even have record title to the subject property until months after the mortgage was entered into.

13

If it was "agreed and understood" that the mortgage and mortgage modification secured the past payments, as Equity maintains, Equity and Mrs. Lenz (through her husband and daughter-lawyer's efforts) would, consistent with their prior practices, have included a description of the debts secured by the mortgage and mortgage modification – just as Equity and Mr. Lenz did in the January 1, 2002 master promissory note and the January 3, 2005 amended loan and security agreement – but they did not. Instead, the mortgage and mortgage modification have no connection to actual money loaned, other than the wishful and untruthful testimony of the three participants in this scheme.

The preponderance of the evidence shows the mortgage was executed in anticipation of the assessments by the IRS against Mr. and Mrs. Lenz in an attempt to shield the subject property from collection by the IRS. Similarly, the mortgage modification was executed in anticipation of the filing of a notice of federal tax lien against Mr. and Mrs. Lenz by the IRS to shield the subject property from IRS collection.

After years of never once making a payment on the mortgage or mortgage modification, finally on May 2, 2008, Mrs. Lenz was served with process in this case. Ms. Daley instituted this action against her mother in 2008 in order to "get paid back." (Hr'g Tr. 82). Ms. Daley acknowledged that while Mrs. Lenz defaulted on the mortgage in 2005, she did not foreclose on the Equity mortgage for two-and-a-half more years, and by that time Mrs. Lenz owed far more in interest. (*See* Hr'g Tr. 98). As reason for the delay, Ms. Daley explained, "she's my mother." (*Id.*). Nevertheless, when Ms. Daley did get around to suing her mother, she sought a judgment for the highest amount of interest allowable by law. (*See id.* 99).

Mrs. Lenz was served at the office of counsel for Equity. Mrs. Lenz did not answer the Complaint, and the Clerk of Court entered a default against her on June 2, 2008. On February 27,

Case No. 08-60630-Civ-Altonaga

2009, the Court entered final judgment [ECF No. 76] against Mrs. Lenz and in favor of Equity for the amount of $5,860,162.09. The final judgment stated the United States' lien on the subject property is superior to Equity's mortgage, consistent with an earlier Order [ECF No. 67] granting the United States' Motion for Partial Summary Judgment. The United States Court of Appeals for the Eleventh Circuit reversed the partial summary judgment, finding a triable issue of fact existed, and remanded the case for trial. *Equity Inv. Partners, LP v. Lenz*, 594 F.3d 1338 (11th Cir. 2010).

## III.  CONCLUSIONS OF LAW

A.     **The Priority of Tax Liens Under Federal Law**

1.     *The Federal Tax Lien Attaches to Karin Lenz's Property and Has Priority Unless Equity Has a "Security Interest" Under 26 U.S.C. § 6323(h)(1).*

Section 6321 of the Internal Revenue Code provides for the imposition of a tax lien in favor of the United States against all property and rights to property owned by any taxpayer who is liable to pay taxes but neglects or refuses to do so. 26 U.S.C. § 6321. This tax lien arises automatically at the time the assessment is made and continues in force until the tax liability is satisfied. 26 U.S.C. § 6322.

The relative priority of a federal tax lien, in relation to competing liens, is determined by federal law. *In re Haas*, 31 F.3d 1081, 1084-85 (11th Cir. 1994) (citing *Aquilino v. United States*, 363 U.S. 509, 513-15 (1960)). Specifically, priority is governed by 26 U.S.C. § 6323, which outlines four circumstances under which a federal tax lien is inferior to a later-created lien. The only relevant provision here, section 6323(a), states:

(a) Purchasers, holders of security interests, mechanic's lienors, and judgment lien creditors. – The lien imposed by section 6321 shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor

15

until notice thereof . . . has been filed by the Secretary.

Equity, as a mortgage holder, is not a purchaser, mechanic's lienor, or judgment lien creditor in relation to the subject property. Therefore, the United States' tax lien – regardless of whether notice of it was filed – takes priority over all later-created interests, including Equity's mortgage interests with Mrs. Lenz, unless those interests are entitled to priority under 26 U.S.C. § 6323(a). At issue here is whether Equity's mortgage and mortgage modification qualify as security interests.

2.   *A "Security Interest" Exists Only Where There Is an Exchange of "Money or Money's Worth."*

Section 6323(h) defines a "security interest" as "any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability." 26 U.S.C. § 6323(h)(1). A security interest exists for priority purposes "(A) if, at such time the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth." *Id.* Thus, to be protected under section 6323(a), the

> holder of a security interest must show: (1) the security interest was acquired by contract to secure payment or performance of an obligation or indemnify against loss; (2) the property to which the security interest was to attach existed at the time of filing of the tax lien; (3) at the time the tax lien was filed, the security interest was protected under state law against a judgment lien arising out of an unsecured obligation; and (4) the holder of the security interest parted with "money or money's worth."

*Equity Inv. Partners, LP*, 594 F.3d at 1343 (quoting *In re Haas*, 31 F.3d at 1085). A mortgage must meet each of these conditions to be a valid security interest and to compete with a federal tax lien. *See In re Garcia*, No. 01-945-CIV, 2002 WL 31409580, at *7 (S.D. Fla. Sept. 6, 2002); *Fla. Land*

Case No. 08-60630-Civ-Altonaga

*Title Co. v. Martinez*, No. 93-1779-CIV-T-17C, 1995 WL 644217, at *8 (M.D. Fla. Aug. 25, 1995).

There is no dispute that the first three requirements are met.  The only issue to resolve based on the testimony and evidence presented at trial is whether Equity parted with "money or money's worth."

> 3.     *"Money or Money's Worth" Includes Past Consideration Under Florida Law, But Only if the Purpose of the Security Interest Was To Secure Repayment of the Past Consideration.*

As prescribed in 26 C.F.R. § 301.6323(h)-1(a)(3), "money or money's worth" is money or "other consideration reducible to a money value."  "Money or money's worth also includes any consideration which otherwise would constitute money or money's worth . . . which was parted with before the security interest would otherwise exist if, under local law, past consideration is sufficient to support an agreement giving rise to a security interest." *Id.*; *accord Equity Inv. Partners*, 594 F.3d at 1344.   While "money or money's worth" includes past consideration, it is only if past consideration may support a security interest under local law.  *Equity Inv. Partners*, 594 F.3d at 1344 ("Federal law determines the priority of competing liens asserted against a taxpayer's property. . . . But, because the Regulations direct us to apply state law to determine whether past consideration may satisfy the "money or money's worth" requirement, Florida law controls this issue.").

Under Florida law, past consideration is sufficient to support the creation of a security interest.  *See* FLA. STAT. § 673.3031(1)(c) (providing that an instrument is issued for value if "issued or transferred as payment of, or as security for, an antecedent claim against any person, whether or not the claim is due"); *see also Lea v. Suhl*, 417 So. 2d 1179, 1181 (Fla. 2d DCA 1982) (issuance of a note in payment of an antecedent obligation rendered additional consideration unnecessary).

To establish that past consideration supports a security interest, however, the holder of the security interest must prove that the purpose of the security interest was to secure repayment of the past consideration. *See Equity Inv. Partners*, 594 F.3d at 1344. The holder of the security interest has the burden of proof on this issue. *See id.* at 1343, 1345.

Further, the party incurring the obligation need not be the party that received the past consideration, if that party agreed at the time the security interest was created that its purpose was to secure the antecedent debts of a third party. *See id.* at 1344 n.3. The Florida statute of frauds, however, requires a promise to answer for the debt of another to be in writing.[10] *See Impac Warehouse Lending Grp., Inc. v. Reali*, No. 2:04-cv-426-FtM-33SPC, 2007 WL 177872, at *2 (M.D. Fla. Jan. 19, 2007) ("It is clear that the Guarantee is a promise to answer for the debt of another and under the statute of frauds must be in writing."); *Kolski v. Kolski*, 731 So. 2d 169, 171 (Fla. 3d DCA 1999). The writing may "take almost any possible form," but the statute requires "written evidence from which the whole contract may be made out." *Kolski*, 731 So. 2d at 171.

**B.     Equity's Mortgage and Mortgage Modification Are Not Entitled to Priority**

The United States' tax lien arose automatically at the time of its assessments against Mr. and Mrs. Lenz, on August 2, 2004 and when the Notice of Federal Tax Lien was recorded on August 16, 2005. Equity's mortgage and mortgage modification are not entitled to priority over the United States' tax lien because they do not qualify as security interests under 26 U.S.C. § 6323(a). Although

---

[10]   The Florida statute of frauds provides: "No action shall be brought whereby to charge . . . the defendant upon any special promise to answer for the debt . . . of another person . . . unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith . . . ." FLA. STAT. § 725.01.

Case No. 08-60630-Civ-Altonaga

past consideration certainly may support a security interest under Florida – and thus under federal law – Equity has not met its burden of proving that the mortgage and mortgage modification were incurred to secure the past payments at issue here, for the following reasons.

The Court begins by observing that statements made by the Lenzes and Ms. Daley prior to trial, in their depositions and affidavits, to the effect that the mortgage and its modification were entered as security for the loans Equity had made to the Lenzes,

> *could* suffice to establish the purpose of the mortgage and mortgage modification. While the statements may be 'self-serving' and may not be 'objective evidence,' they are evidence nonetheless. *If believed*, they would support a finding that the mortgages were given to satisfy the antecedent debts. . . . The truth of these statements, however, is disputed.

*Equity Inv. Partners*, 594 F.3d at 1345 (emphasis added). After carefully observing the demeanor and appearance of each witness who testified, the Lenzes and their daughter Ms. Daley, the Court is convinced that these statements and similar ones made at trial are not worthy of belief. *See United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) ("Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses."). And there are "'specific, cogent reasons'" for this adverse credibility finding. *Sauveur v. U.S. Att'y Gen.*, 167 F. App'x 755, 757 (11th Cir. 2006) (quoting *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005)).

The documentary evidence concerning Mr. Lenz's early borrowing from Equity in 2002 – when he needed liquidity due to the asset freeze – shows an acknowledgment of loans Equity anticipated making for legal fees (Tr. Exs. 66, 67), while the mortgage (Tr. Ex. 43) and mortgage

modification (Tr. Ex. 44) do not similarly list funds Equity previously loaned or expected to loan. None of the witnesses gave adequate explanation for the differences in the substance of the documentation, prepared by attorney Daley and concerning which Mr. Lenz was an active participant. And the documentary evidence pertaining to Equity and the loans or advances it purportedly made to the Lenzes bears no relation to the sums accounted for in the mortgage or mortgage modification.

The three witnesses' testimony concerning the transfer of the subject property from Mr. Lenz to Mrs. Lenz was wholly incredible. In particular, the Court noted a marked change in Mrs. Lenz's demeanor when answering questions regarding her success in obtaining the transfer. She smiled awkwardly and appeared more uncomfortable than she did with the rest of her testimony.

Mr. Lenz, a convicted felon, testified with mostly short, abrupt responses. Mrs. Lenz's in-court testimony so contradicted her earlier deposition testimony, that this, combined with her denials of any knowledge of mailings received at her home from the IRS, made her testimony entirely incredible. Ms. Daley, a practicing attorney, was somewhat better prepared in her testimony, but she, too, was impeached with contradictory statements she had made in her pre-trial deposition. Her seeming concern for her mother in some answers was belied by her actions of suing Mrs. Lenz and seeking the highest amount of interest in the judgment against her. In short, the testimony of these family participants appeared tailored to perpetrate a fraud.

Equity has also not shown that the majority of the past payments allegedly secured by the mortgage and mortgage modification were made to or for Mrs. Lenz. Thus, even if Equity had established that both Mrs. Lenz and Equity agreed that the mortgage and mortgage modification were

executed to secure repayment of the past payments, the mortgage and mortgage modification still do not qualify as security interests under Florida law for the amount Equity claims because all or virtually all of the past payments were to Randolph Lenz. There is no written evidence that Mrs. Lenz agreed to assume the debts of Mr. Lenz, as required by the Florida statute of frauds. Thus, her purported assumption of his debts is not sufficient to establish a security interest under Florida law, and it does not qualify as "money or money's worth" under 26 U.S.C. § 6323(h).

Finally, even if Mrs. Lenz and Equity agreed that they executed the mortgage and mortgage modification to secure repayment of the past payments and that the payments were made to Mrs. Lenz, the mortgage and mortgage modification still do not qualify as security interests under Florida law for the amount Equity claims because a substantial amount of the past payments were made by entities other than Equity. As comments to the Florida statute defining consideration suggest, an antecedent claim can give rise to a security interest only where the security interest is given to the party that made the prior loans. *See* FLA. STAT. § 673.3031 cmt. 1 (providing as an example of past consideration "X owes Y $1,000. The debt is not represented by a note. Later X issues a note to Y for the debt."); *In re Garcia*, 2002 WL 31409580, at *5 (absent documentation of agreement to have third party transfer money to mortgagee on behalf of mortgagor, there was insufficient evidence that mortgagor parted with money or money's worth such that security interest arises under federal statute). Thus, even if Equity's payments were considered past consideration, the payments made to and for Mr. Lenz by First Out Corporation, Corsta Corporation, and Equity Merchant Banking Partnership, LLLP, and those made by Equity to Equity Merchant Banking Corporation, do not constitute money or money's worth under the mortgage or mortgage modification.

Case No. 08-60630-Civ-Altonaga

**C.      Equity's Mortgage and Mortgage Modification Are Fraudulent Transfers Under Florida Law**

Finally, the Government contends the mortgage and mortgage modification were fraudulent transfers because they were made with an intent to defraud the IRS.  Under Florida law,

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor . . . .

Fla. Stat. § 726.105(1).  In determining actual intent under paragraph (1)(a), consideration may be given, among other factors, to whether:

> (a) The transfer or obligation was to an insider.
>
> (b) The debtor retained possession or control of the property transferred after the transfer.
>
> (c) The transfer or obligation was disclosed or concealed.
>
> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
>
> (e) The transfer was of substantially all the debtor's assets.
>
> (f) The debtor absconded.
>
> (g) The debtor removed or concealed assets.
>
> (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
>
> (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
>
> (j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

22

(k) The debtor transferred the essential assets of the business . . . .

FLA. STAT. § 726.105(2). These factors (*i.e.*, badges of fraud) are nonexclusive, *see In re Jennings*, 332 B.R. 465, 469-70 (Bankr. M.D. Fla. 2005), and the transfer need not satisfy all of them to prove fraud, *see Mejia v. Ruiz*, 985 So. 2d 1109, 1113 (Fla. 3d DCA 2008) ("While a single badge of fraud may amount only to a suspicious circumstance, a combination of badges will justify a finding of fraud."). In addition, courts may take into account the circumstances surrounding the conveyance. *See id.*

The party seeking to void the transfer or obligation must prove by a preponderance of the evidence that the conveyance was fraudulent. *See id.* The existence of several badges of fraud, however, establishes a prima facie case of fraudulent intent and creates a rebuttable presumption that the conveyance is void. *See id.* The burden then shifts to the opposing party to demonstrate that the transfer was made without intent to "delay, hinder or defraud" creditors. *Id.* at 1114 (internal quotation marks and citations omitted).

For example, a transfer was fraudulent where it was to an insider, the debtor retained possession of the property, the transfer was not for reasonably equivalent value, the debtor was insolvent or became insolvent shortly after the transfer, and the transfer occurred shortly after a tax liability arose. *See United States v. Labato*, No. 6:97-CV-900-ORL287GG, 2002 WL 1770804, at *9 (M.D. Fla. June 18, 2002). Similarly, a transfer was fraudulent where it was to an insider, the debtor retained control of the property, and the debtor was aware that the IRS "could be seeking a substantial judgment against him." *Veigle v. United States*, 873 F. Supp. 623, 626-27 (M.D. Fla. 1994). *See also Mejia*, 985 So. 2d at 1113-14 (finding a transfer fraudulent where "[m]ost of the

23

factors listed in the statute [were] present" and defendant "put forth no evidence to rebut [plaintiff's] showing").

Applying these factors, both the mortgage and mortgage modification are fraudulent transfers under Florida law and are set aside; the United States' tax lien thus takes priority.

First, the mortgage and mortgage modification were transfers to the functional equivalent of an insider.  Although the transfers were not conveyed to an insider as defined by Florida statute,[11] as noted above, a court may consider factors not listed in section 726.105(2).  Mrs. Lenz gave the mortgage and mortgage modification to Equity, a company formed by her husband and owned by her children, and thus they are transfers to the functional equivalent of an insider.  *See In re Dealers Agency Servs., Inc.*, 380 B.R. 608, 613-14 (Bankr. M.D. Fla. 2007) (finding transfer fraudulent where debtor's transfer went to limited liability company controlled by then-girlfriend); *In re Blitstein*, 105 B.R. 133, 135 (Bankr. S.D. Fla. 1989) (transfer of property was to holding company owned by debtor's brother and sister-in-law); *Scott v. Dansby*, 334 So. 2d 331, 333 (Fla. 1st DCA 1976) (close relationship between parties involved in alleged fraudulent transfer tends to establish prima facie case which must be met by sufficient evidence).

Second, Mrs. Lenz retained possession of the subject property after she incurred the

---

[11]  Pursuant to Florida Statutes section 726.102(7)(a), if the debtor is an individual, an "insider" includes:

1.  A relative of the debtor or of a general partner of the debtor;

2.  A partnership in which the debtor is a general partner;

3.  A general partner in a partnership described in subparagraph 2.; or

4.  A corporation of which the debtor is a director, officer, or person in control[.]

obligations. *See In re Am. Way Serv. Corp.*, 229 B.R. 496, 529-35 (Bankr. S.D. Fla. 1999) (debtor maintained control over sale proceeds of "collection cars" and retained possession and control of boat after transfer); *Amjad Munim, M.D., P.A. v. Azar*, 648 So. 2d 145, 152-53 (Fla. 4th DCA 1994) (transferor retained control of assets after transfer). While Mrs. Lenz's retention of possession of the subject property initially is not remarkable (given that the obligations were a mortgage and a mortgage modification), Mrs. Lenz retained possession of the property for years despite never making a single repayment on the mortgage or mortgage modification, and Equity never made a single demand for payment. Instead, after taking no action related to the mortgage or mortgage modification for years, Equity brought this suit in collusion with Mrs. Lenz in an attempt to extinguish the tax lien on the property.

Third, Mrs. Lenz concealed her incurring of the mortgage in that at the time Equity and Mrs. Lenz executed the mortgage, Mrs. Lenz did not have record title to the subject property. *See Mejia*, 985 So. 2d at 1113 (debtor did not disclose it had sold its only asset); *In re Am. Way*, 229 B.R. at 533 (debtors concealed true nature of transactions from judgment creditor and IRS through collusive use of strawman and undocumented "loan"). Although Mrs. Lenz received title to the subject property on June 11, 2002 through a warranty deed, and she executed the mortgage in October 2004, she did not record the warranty deed in the Broward County public records until February 22, 2005.

Fourth, the transfer was of substantially all of Mrs. Lenz's assets. *See In re Dealers Agency*, 380 B.R. at 616 (debtor conveyed substantially all of his assets to company controlled by girlfriend); *In re Knapp*, 146 B.R. 294, 297 (Bankr. M.D. Fla. 1992) (transfer included substantially all of judgment debtor's assets and debtor removed a major asset from the reach of creditors). Mrs. Lenz

had no significant assets other than the subject property, and she earned no income.

Fifth, the value of the consideration allegedly received by Mrs. Lenz – the past payments from her children – was not reasonably equivalent to the amount of the obligation she incurred. *See In re Revels*, No. 05-13351-3P7, 2007 WL 1756987, at *5 (Bankr. M.D. Fla. Jan. 31, 2007) (conveyance was fraudulent where debtor received less than $33,000 for his interest in properties valued over $200,000). As explained above, by its own accounting, Equity had already advanced much more than $1 million to the Lenzes at the time Equity and Mrs. Lenz entered into the $1 million mortgage. And even more telling, in the period between the mortgage and mortgage modification, Equity – again, by its own accounting – advanced to the Lenzes only about $435,000, even though the modification increased the amount of the mortgage by $2,000,000. Thus, the mortgage and mortgage modification Mrs. Lenz incurred did not even roughly approximate the funds she and her husband allegedly received.

Sixth, the mortgage and mortgage modification rendered Mrs. Lenz insolvent, as the subject property was her only asset. *See Mejia*, 985 So. 2d at 1111 (debtor sold its only asset).

Seventh, the mortgage and mortgage modification occurred shortly before or after substantial debts were incurred. *See Veigle*, 873 F. Supp. at 627 (taxpayer was aware when he transferred parcels that the IRS was calculating his tax liability and could be seeking substantial judgment against him); *Amjad Munim*, 648 So. 2d at 145 (doctor's transfer of assets to medical association occurred shortly after he incurred substantial debt). Mrs. Lenz incurred the mortgage just four months after she entered into a closing agreement with the IRS admitting to the liability and only two months after the IRS assessed a substantial tax liability against her. In addition, Mrs. Lenz incurred

Case No. 08-60630-Civ-Altonaga

the mortgage modification shortly – merely two weeks – before the IRS filed a Notice of Federal Tax Lien against her and Mr. Lenz to secure the tax debt.  At that time, Mr. and Mrs. Lenz were indebted to the IRS for $2,406,549.86.

Thus, the evidence demonstrates Mrs. Lenz's incurring of the mortgage and mortgage modification were fraudulent transfers under Florida Statutes section 726.105(1).  The multiple badges of fraud establish a prima facie case that Mrs. Lenz incurred the mortgage and mortgage modification with the intent to defraud, hinder, or delay the IRS; create a rebuttable presumption that the conveyances are void; and shift the burden to Equity to show an absence of fraudulent intent. The incredible and inconsistent testimony of Equity's witnesses, discussed in detail above, is not sufficient to satisfy its burden.  Pursuant to Florida Statutes section 726.105(1), the mortgage and mortgage modification are set aside as fraudulent transfers.

## IV.  CONCLUSION

The Court resolves the issues in favor of the United States and against Equity.  The mortgage and mortgage modification were not executed to secure repayment of loans made to Mrs. Lenz.  The testimony of the participants to this scheme was simply not worthy of belief, and the documents admitted provide inconsistent and incomplete support for the position taken so as to overcome the discredited testimony.  Because the mortgage and mortgage modification were executed in an orchestrated attempt by the Lenzes and Ms. Daley to defeat the priority of the IRS lien on the subject property, Equity does not have a security interest in the subject property under 26 U.S.C. § 6323(h)(1).  In addition, the mortgage and mortgage modification are set aside as fraudulent transfers under Florida Statutes section 726.105(1) because they were made with the intent to delay, hinder,

Case No. 08-60630-Civ-Altonaga

or defraud the IRS.

Accordingly, it is

**ORDERED AND ADJUDGED** that final judgment will be entered by separate order in favor of the IRS and against Equity.  The Government is to submit a proposed order of final judgment by July 30, 2010.

**DONE AND ORDERED** in Chambers at Miami, Florida this 28th day of July, 2010.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT COURT**

cc:     counsel of record

28